**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **TIMOTHY D. SCOTT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:18-cv-00051-O-BP** |
| | § | |
| **NANCY A. BERRYHILL,** | § | |
| **Acting Commissioner of the** | § | |
| **Social Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES**
**MAGISTRATE JUDGE, NOTICE, AND ORDER**

Plaintiff Timothy D. Scott ("Scott") filed this action under 42 U.S.C. § 405(g), seeking judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of his application for disability insurance benefits under Title II of the Social Security Act ("SSA"). (ECF No. 1). After considering the pleadings, briefs, and the administrative record, the undersigned **RECOMMENDS** that United States District Judge Reed O'Connor **AFFRIM** the Commissioner's decision.

## I.     STATEMENT OF THE CASE

Scott protectively filed his application for disability benefits on May 22, 2015, alleging a disability onset date of February 28, 2015. (Transcript ("Tr.") 61, 165, 187). The Commissioner initially denied his application for benefits on July 17, 2015, (Tr. 80–83), and denied them again upon reconsideration on September 25, 2015, (Tr. 85–87). Scott requested a hearing before an Administrative Law Judge ("ALJ"), (Tr. 88–89), and a hearing was held before an ALJ on March 23, 2017, (Tr. 28). Scott appeared before the ALJ in Oklahoma City, Oklahoma. (*Id.*). An attorney represented Scott at the hearing. (*Id.*). Vocational Expert ("VE") David Couch testified at the

hearing. (*Id.*). The ALJ issued her decision on June 28, 2017, finding that Scott was not disabled under the SSA and, therefore, not entitled to disability benefits. (Tr. 21).

In her decision, the ALJ employed the statutory five-step analysis. At step one, she found that Scott had not engaged in substantial gainful activity since February 28, 2015, the alleged disability onset date. (Tr. 11, Finding 1). At step two, the ALJ found that Scott had the severe impairments of affective disorder, anxiety disorder, post-traumatic stress disorder ("PTSD"), and attention deficit hyperactivity disorder ("ADHD"). (Tr. 11, Finding 3). At step three, the ALJ found that Scott's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. § 404(P)(1). (Tr. 12, Finding 4). The ALJ, therefore, determined that Scott had the residual functional capacity ("RFC") to perform "a full range of work at all exertional levels but with the following nonexertional limitations: Work must be limited to simple, routine, and repetitive tasks free from production rate pace. He can have occasional interaction with coworkers, supervisors, and the public." (Tr. 14, Finding 5). At step four, with this RFC, the ALJ found that Scott was unable to perform his past relevant work as a police officer. (Tr. 20, Finding 6). At step five, after considering the VE's testimony and Scott's age, education, work experience, and RFC, the ALJ determined there were a significant number of jobs in the national economy that he could perform. (Tr. 20, Finding 10). Thus, the ALJ ruled Scott had not been disabled from February 28, 2015 through the date of her decision on June 28, 2017. (Tr. 21–22).

The Appeals Council denied Scott's request for review on February 12, 2018. (Tr. 1–5). Therefore, the ALJ's decision became the Commissioner's final decision and is properly before the Court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005) ("[T]he Commissioner's final decision includes the Appeals Council's denial of a request for review.").

## II.      FACTUAL BACKGROUND

Scott was born on February 21, 1974 and was forty-one years old on his alleged disability onset date. (Tr. 62, 187). Scott has at least a high school education. (Tr. 20, 38). Scott's severe mental impairments stem from an accidental shooting that caused the death of his three-year-old son on August 2, 2012. (Tr. 32–33). At the time of the accident, Scott was a police officer with the city of Denton. (*Id.*at 33). Scott returned to work, but was eventually asked to retire in February 2015. (Tr. 32).

## III.      STANDARD OF REVIEW

Title II, 42 U.S.C. § 404 *et seq.* of the SSA controls the disability insurance program as well as numerous regulatory provisions concerning disability insurance. *See* 20 C.F.R. Pt. 404. The SSA defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).

To determine whether a claimant is disabled and thus entitled to disability benefits, the Commissioner employs a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4). For step one, the claimant must not be presently working at any substantial gainful activity to obtain disability benefits. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial gainful activity" means work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1572; *Masterson v. Barnhart*, 309 F.3d 267, 271 n.2 (5th Cir. 2002). For step two, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c); *see also Stone v. Heckler*, 752 F.2d 1099, 1100–03 (5th Cir. 1985). For step three, disability exists if the impairment or combination of impairments meets or equals an impairment

3

listed in the Listing of Impairments ("Listing") found in 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. § 404.1520(d). Before proceeding to step four, the Commissioner must assess the claimant's RFC—"the most the claimant can still do despite his physical and mental limitations." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); 20 C.F.R. § 416.945(a)(1). For step four, if the claimant's medical status alone does not constitute a disability, the impairment must prevent the claimant from returning to his past relevant work. 20 C.F.R. § 404.1520(e). For step five, the impairment must prevent the claimant from doing any work, considering the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(f); *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir. 1999). "The claimant bears the burden of showing [he] is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform." *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). "If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000) (quoting *Crowley*, 197 F.3d at 198).

The Court's decision is limited to a determination of whether the Commissioner applied the correct legal standards and whether substantial evidence in the record as a whole supports the decision. *Audler*, 501 F.3d at 447; *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). "Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)). The Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but it will carefully scrutinize the record to determine if evidence is

4

present. *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Harris*, 209 F.3d at 417. "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (quoting *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).

## IV.    ANALYSIS

Scott raises three issues on appeal. First, he claims that the ALJ's RFC was insufficient to address Scott's more specific functional limitations and the ALJ findings in steps four and five were not supported by substantial evidence. The undersigned construes this issue, and accompanying sub-issues, as a broad attack on the ALJ's RFC. Second, Scott claims the ALJ failed to consider the treating source opinion from his therapist, and third, he claims that the ALJ failed to incorporate limitations observed by his mental health nurse. The undersigned addresses these issues in reverse order.

### A.    The ALJ was not required to weigh the opinion of Susan B. McGraw, LCSW, LPC.

Scott argues that the ALJ erred when she failed to consider the opinion of Susan B. McGraw, LCSW, LPC ("McGraw"). (ECF No. 13 at 21–22). Although every medical opinion is evaluated regardless of its source, the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. McGraw is a licensed clinical social worker and a licensed professional counselor who treated Scott beginning shortly after the death of his son through January 30, 2014. (Tr. 368–369). She wrote a retrospective report describing Scott's mental state and how it improved over the course of his treatment. (*Id.*). Scott concedes that McGraw is not an acceptable medical source under the Commissioner's rules. (ECF No. 13 at

5

22). Thus, Scott was not required to "weigh" the opinion of McGraw. 20 C.F.R. §§ 404.1527(c), 416.927(c).

Even if McGraw were an acceptable medical source, her report did not contain a medical opinion. Medical opinions are statements from an acceptable medical source that reflect judgments about the nature and severity of a claimant's impairments, what a claimant can still do despite his impairments, and his physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Although McGraw's report provided a summary of her clinical observations and diagnosis, it does not contain a statement about what Scott can still due despite his mental impairments; nor did it describe any physical or mental restrictions. (Tr. 368–69). Thus, the report did not contain a medical opinion and the ALJ was under no duty to weigh it.

Nevertheless, Scott contends that McGraw's report was entitled to some consideration, which the ALJ allegedly failed to do. Contrary to Scott's assertion, the ALJ did consider McGraw's report in her RFC assessment. Further, the ALJ used the report to show how Scott had improved with therapy. The ALJ compared his initial global assessment of functioning ("GAF") score of 35 and noted that it had improved with therapy to a score of 60. (Tr. 15). And the ALJ highlighted comments from McGraw's report discussing how Scott had progressed to a more stable emotional state. (Tr. 15–16). Thus, the ALJ did consider McGraw's report and did not err as Scott alleged.

**B.    The ALJ properly considered the observations of Linda Towbridge, APRN, PMHNP-BC.**

Scott argues that the ALJ erred by not considering and incorporating in her RFC assessment several of Scott's subjective complaints that Linda Towbridge, APRN, PMHNP-BC ("Towbridge") observed. (ECF No. 13 at 22).

Scott cites to Towbridge's progress notes to show that he received treatment for several mental symptoms including rage, irritability, rapid mood swings, memory difficulty, anxiety, low

frustration tolerance, and feelings of loss. (*Id.* at 22–23). Scott contends that more limitations should have been incorporated into his RFC to accommodate these mental symptoms. (*Id.* at 23). Scott specifically alleges that the ALJ's RFC did not incorporate a limitation for pace for when he is "overcome by his grief." (*Id.*). But the ALJ did consider Towbridge's progress notes. In fact, the ALJ discussed and cited to nearly every page of Towbride's progress notes. (Tr. 17–18). The ALJ wrote that Scott reported "some anxiety being around others and difficulty controlling emotions, which supports him limiting him to occasional interaction[s] with coworkers, supervisors, and the public. However, because the objective examinations repeatedly show normal behavior and attitude, the [ALJ] finds that he does not have greater social limitations." (Tr. 17) (internal citation omitted). And contrary to Scott's assertion that the ALJ did not incorporate a reduction in pace, the ALJ's RFC specifically limits Scott's work to "simple, routine, and repetitive tasks *free from production rate pace*." (Tr. 14) (emphasis added). Thus, the ALJ properly considered Towbridge's progress notes and incorporated limitations from those notes in describing Scott's mental impairments.

Moreover, Scott cites to *Milligan v. Colvin*, No. 2:12-CV-101, 2013 WL 5345842 (N.D. Tex. Sept. 24, 2013) for the proposition that an ALJ errs at step five by finding a claimant's nonexertional impairments were not significant after finding at step two that the claimant suffered from several severe nonexertional impairments. (Tr. 19). Scott's reliance on *Milligan* is misguided. In that case, the ALJ improperly relied on Medical Vocational Guidelines, commonly referred to as the Grids. *Id.* at *3. The court in *Milligan* concluded that the ALJ should have relied on a VE when a claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments to establish what jobs exist in the national economy. *Id.* at *5–6. Here, the ALJ properly relied on the VE's testimony at step five. Thus, the ALJ did not err.

**C.    The ALJ's RFC is supported by substantial evidence.**

Scott's next several arguments are generally a challenge to the ALJ's RFC assessment. "The responsibility for determining a claimant's RFC lies with the ALJ . . . [, and] the ALJ must discuss the claimant's ability to perform sustained work activity on a regular and continuing basis and resolve any inconsistencies in the evidence." *Ewing v. Colvin*, No. 4:13-CV-085-A, 2014 WL 2464765, at *4 (N.D. Tex. June 2, 2014) (citing *Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990); SSR 96–8p, 1996 WL 374184, at *7 (July 2, 1996)). Moreover, "[t]he ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record." *Id.* (citing *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991)). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations) . . . ." SSR 96–8p, 1996 WL 374184, at *7. "[T]he determination of residual functional capacity is the sole responsibility of the ALJ." *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)).

In the ALJ's RFC assessment, she proceeded through a well-reasoned and thorough discussion of Scott's disabilities and how they limit his ability to perform work-related activities. (Tr. 14–20). The ALJ determined that Scott had the RFC to perform "a full range of work at all exertional levels but with the following nonexertional limitations: Work must be limited to simple, routine, and repetitive tasks free from production rate pace. He can have occasional interaction with coworkers, supervisors, and the public." (Tr. 14). Scott argues that the ALJ's RFC assessment is not sufficient to address all of Scott's functional limitations and is, therefore, not supported by substantial evidence. (ECF No. 13 at 9).

The ALJ's RFC assessment is supported by substantial evidence. The ALJ must consider all of the claimant's "medically determinable impairments . . . including [those] that are not 'severe,'" and "all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(2)–(3). The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered. *See* SSR 96–8p, 1996 WL 374184, at *3–*5. But, "[t]he relative weight to be given [to the] evidence is within the ALJ's discretion." *Chambliss v. Massanari*, 269 F.3d 520, 523 n.1 (5th Cir. 2001) (citation omitted).

In making her RFC assessment, the ALJ 'considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[.]" (Tr. 14). In doing so, the ALJ's decision, which included a six page "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)," as required by SSR 96-8p. 1996 WL 374184, *7. (Tr. 14–20). After a review of Scott's disability records and his testimony at the hearing, the ALJ concluded that Scott's medically determinable impairments could reasonably be expected to cause Scott's alleged symptoms. (Tr. 15). Next, the ALJ discussed the intensity, persistence, and limiting effects of Scott's symptoms to determine the extent to which they limit his functional limitations. (*Id.*). The ALJ found that Scott's statements of intensity, persistence, and limiting effects of his symptoms were not consistent with the medical evidence and other evidence in the record. (*Id.*).

The ALJ gave great weight to Scott's primary care physician Dr. Jones. (Tr. 19). The ALJ pointed to Dr. Jones' examinations where he opined that Scott could "compete and excel at physical endeavors." (Tr. 18; 278, 341). Dr. Jones also stated that he found it odd that Scott's "job was asking for a medical retirement," and that Scott is in the "most stable place mentally . . . pre

9

or post trauma." (Tr. 350). The ALJ gave Dr. Jones' medical opinion great weight because he was Scott's treating physician with a lengthy relationship, and his medical opinions were consistent with treatment records. (Tr. 19).

The ALJ also gave substantial weight to state agency psychological consultants Dr. Snapp and Dr. Germain. She noted that both consultants provided mental residual functional capacity assessments based upon a review of the record. (Tr. 19). Dr. Snapp made his assessment on July 15, 2015, and Dr. Germain made her assessment on September 21, 2015. (Tr. 55–58, 71–75). Both found that Scott could "carry out very short and simple instructions, understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, and accept instructions and respond appropriately to changes in a routine work setting." (Tr. 19, 57, 73). The ALJ gave these opinions substantial weight because each consultant is an acceptable medical source with substantial expertise and experience in making mental RFC assessments, specialize in psychology, and have knowledge of the Social Security disability rules and regulations. (Tr. 19). The ALJ noted that their mental RFCs were consistent with the medical record since Scott's alleged disability onset date, and the progress notes from McGraw, received before the hearing, showed that Scott continued to improve. (*Id.*).

The ALJ considered and gave little weight to the function report submitted by Scott's wife. (Tr. 19). The ALJ gave little weight to this report because she is not an acceptable medical source; the statements made in the report are neither functional nor diagnostic; by virtue of their relationship, the statements in the report may be colored by her affection for Scott; and the statements are inconsistent with other medical evidence in the record. (Tr. 19).

The ALJ also discussed at length Scott's therapy with McGraw, his continued therapy with Towbridge, and the opinions of his treating psychiatrist Dr. Islam. Although the ALJ did not weigh

the medical opinions of Dr. Islam, who treated Scott prior to his alleged disability onset date, she did consider them. The ALJ discussed Scott's last three mental examinations performed by Dr. Islam. (Tr. 16). The ALJ noted in Scott's follow-up examinations on August 22, 2014, (Tr. 287–89), and October 31, 2014, (Tr. 290–92), that he presented with abnormally rapid speech, pressured speech, and tangential thought process. (Tr. 16, 285, 288). As a result, the ALJ limited Scott's work to simple, routine, and repetitive tasks. (Tr. 16). And as already noted, the ALJ considered Towbridge's progress notes and limited his work to occasional interactions with coworkers, supervisors, and the public. (Tr. 17). Both of these limitations are incorporated in the ALJ's RFC assessment.

Finally, the ALJ discussed the GAF scores from McGraw. The ALJ considered the scores insofar as they provide a snapshot as to the severity of Scott's ability to function at that discrete point-in-time, but she ultimately gave the scores little weight because the Commissioner has not officially endorsed the GAF scale. (Tr. 20).

Given this recitation of what the ALJ considered and the weight given to relevant medical opinions and evidence in the record, the undersigned finds that the ALJ performed the required function-by-function assessment that was properly supported by the record. Accordingly, the ALJ's RFC is supported by substantial evidence.

### i.    Scott's sole past relevant work was as a police officer.

Scott contends that the ALJ erred when she failed to consider all of Scott's past relevant work ("PRW") experience, namely his cleaning and desk duty assignments while he was a police officer. (ECF No. 13 at 10–11). Scott argues that failure to consider these jobs as PRW was error because it proves that Scott is unable to perform "the same kind of simple work . . . which the ALJ is now finding he can perform[.]" (*Id.* at 10). The Commissioner argues that Scott performed the cleaning job before he was cleared by a psychiatrist to return to his regular job. (ECF No. 14 at 3).

And, although he was moved to desk duty after being removed from two-man patrols, the desk duty assignment involved more than performing simple, routine, and repetitive tasks. (*Id.*). Further, the Commissioner contends that Scott neither alleged nor argued at the hearing that these jobs should be considered PRW. (*Id.*).

Scott's argument here is a bit convoluted. Essentially though, Scott is arguing that because the Denton Police Department asked him to retire early for medical reasons, after he was reassigned from his two-man patrol to desk duty, then this is evidence that the ALJ's RFC does not contain all of the necessary limitations. (*Id.* at 10) ("Mr. Scott had already failed in performance of the same kind of simple work (office cleaner/clerical helper) which the ALJ is now finding he can perform up to the very heavy level—an even heavier level of strength than he was working at the end.").

This argument is unpersuasive. An ALJ's RFC assessment is "the most [a claimant] can still do despite [his] limitations" and is "based on all of the relevant evidence *in [the] case record*." 20 C.F.R. § 416.945(a)(1) (emphasis added). Although PRW is relevant evidence, Scott still has the burden of proof for the first four steps in the Commissioner's sequential evaluation process. SSR 82-62, 1982 WL 31386, at *1 (1982) ("Work for which the individual has demonstrated a capability is the best indicator of the kind of work that the individual can be expected to do"); *Audler*, 501 F.3d at 448 ("The claimant bears the burden of showing she is disabled through the first four steps of the analysis[.]").

First, Scott failed to allege in his disability application, his representative brief that was prepared by counsel, or in his complaint, that these "jobs" were PRW, and at the administrative hearing, his attorney failed to question him about these jobs or ask a hypothetical question to the VE that incorporated any alleged deficiencies in the ALJ's hypothetical questions. (Tr. 47, 207,

266, 269–270); (ECF No. 1). In the Fifth Circuit, a hypothetical question is defective and in error unless "(1) the assumptions reasonably incorporate all of the disabilities recognized by the ALJ, and (2) the claimant is afforded the opportunity to correct deficiencies in the ALJ's question." *Guillen v. Astrue*, 584 F. Supp. 2d 930, 940 (W.D. Tex. 2008) (citing *Boyd*, 239 F.3d at 707; *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994) (per curiam)). Scott emphasizes the difference in the exertional demands of his cleaning and desk duty jobs versus the ALJ's RFC, (ECF No. 13 at 10), that states Scott can perform work at "a full range of work at all exertional levels," (Tr. 14). Here, Scott's attorney did not cross-examine the VE about the ALJ's hypothetical questions even though he was given a chance to do so. (Tr. 47). Further, the ALJ's hypothetical questions reasonably incorporated all of Scott's mental disabilities identified in the record prior to the hearing. Relevant to Scott's objection about the absence of any physical limitations, the ALJ's RFC is consistent with the record that does not reflect any alleged physical limitations. (Tr. 203, 216, 235) (checked boxes indicating only mental limitations); (Tr. 209) (stating he has not been the same person "mentally" since the accident). Moreover, at the hearing, Scott's attorney said "There's really nothing as far as physical impairment here. This is all boiling down to some PTSD, bipolar, anxiety, and depressional-type [sic] issues with some mixed ADHD." (Tr. 31). Thus, Scott has failed to show, much less prove, any physical limitations that the ALJ should have incorporated in her hypothetical question to the VE.

To the extent Scott is arguing that the ALJ should have developed the record regarding Scott's cleaning and desk duty activities, an ALJ's duty to develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Williams v. Colvin*, No. 4:14-CV-988-O-BL, 2016 WL 4059235, at *3 (N.D.

Tex. July 6, 2016) (quoting *Mayes v. Massanari*, 276 F.3d 453, 459–60 (5th Cir. 2001)), *adopted by*, No. 4:14-CV-988-O, 2016 WL 4039187 (N.D. Tex. July 28, 2016).

Scott's testimony at the hearing is insufficient to trigger the ALJ's duty to further develop the record. He testified that his cleaning job was only for a "little while" until he was "cleared by a psychiatrist." (Tr. 35). After Scott was cleared for duty, he returned to a two-man unit. (*Id.*). Later, though, he was placed on desk duty for a year. (*Id.*). The fact that Scott was on desk duty for a year does not prove that he had a different job. In his disability application, he described his past work as a police or patrol officer, (Tr. 207, 266), and described those jobs to include reports, tickets, fights, domestic disturbances, robberies, person with a gun or knife, theft, and suicidal subjects, (Tr. 208). Further, Scott characterized desk duty to include "[t]aking reports." (Tr. 211). Scott has made no argument that desk duty was not a regular activity performed by a police officer. Thus, Scott's desk duty job appears to be within the duties of a police officer rather than a separate job. Nor does Scott argue how his desk duty might impact the ALJ's RFC. Further, the VE, who testified at the hearing and heard Scott's testimony about these alleged "new" jobs, identified Scott's past work history solely as a police officer. (Tr. 45). Moreover, prior to the hearing, Scott's counsel filed a representative brief stating that Scott only performed the occupation of police officer over the relevant time-period. (Tr. 269). Thus, Scott has failed to show how the record was ambiguous or inadequate such that the ALJ could not perform a proper evaluation of his disability. Accordingly, the ALJ did not err by considering Scott's work as a police officer as his sole PRW.

### ii. Scott failed to allege any physical limitations.

Next, Scott argues that the ALJ erred because she failed to consider his physical limitations as a result of his missing ring finger and lyme disease. (ECF No. 13 at 13). It is true that the ALJ did not discuss much of Scott's physical limitations. But as discussed above, this is because Scott did not make the ALJ or VE aware of any physical limitations in his application for disability,

elsewhere in the record, or at the hearing. Thus, the ALJ "must consider [Scott] to have no limitation or restriction with respect to that functional capacity" because no allegation of a physical limitation was made. SSR 96-8P, 1996 WL 374184, at *3. Scott points to a single page of medical notes out of a 436-page record that summarizes his medical history that shows he had lyme disease in the past and no ring finger on his left hand. (Tr. 429).

At step five, the Commissioner has the burden to prove that the claimant can engage in alternative work that exists in the national economy. *Newton*, 209 F.3d at 453. The Commissioner makes this showing by relying on a VE's response to a hypothetical question that incorporate all disabilities recognized by the ALJ. *See Bowling*, 36 F.3d at 435. The Claimant must be afforded an opportunity to correct any deficiencies in the ALJ's hypothetical question to the VE. *Id.* However, if the VE fails to do so, a defective hypothetical question is not automatically salvaged as a proper basis for a determination of non-disability. *Boyd*, 239 F.3d at 707. If the Commissioner makes a proper showing, then the burden shifts back to the claimant to rebut the finding that there are jobs that exist in significant numbers that the claimant can perform. *Newton*, 209 F.3d at 453.

Here, after the VE testified about Scott's past work history as a police officer and finding Scott would be unable to perform it, the ALJ asked the VE three hypothetical questions. (Tr. 46–47). The first hypothetical question was identical to the ALJ's RFC without the production pace limitation. (Tr. 46). The VE found three jobs under the first hypothetical question the ALJ posed—hand packer, janitor, and warehouse worker. (*Id.*). The second hypothetical question was identical to the ALJ's RFC that included a limitation for jobs that were "free of production rate pace." (*Id.*). The VE stated he would replace the hand packer and warehouse worker jobs with floor waxer and industrial sweeper. (*Id.*). The third hypothetical incorporated hypothetical number two but included four unscheduled work breaks each day, lasting ten minutes in an eight-hour day. (*Id.*).

15

The VE opined that, with this added limitation, all work was precluded. (*Id.*). Scott's counsel did not ask the VE any hypothetical questions to rebut his finding that Scott could perform the jobs the VE described. (Tr. 47). Further, Scott has failed to point to any medical opinion or evidence describing how lyme disease or his missing ring finger might impact his ability to perform the jobs described by the VE. Because there is no evidence in the record substantiating any limitations resulting from Scott's lyme disease and missing ring finger, the ALJ's hypothetical questions that modeled her RFC assessment reasonably incorporated all of Scott's disabilities. Accordingly, Scott has not met his burden of rebutting the VE's finding that there are a significant number of jobs in the national economy that he can perform.

Scott further argues that the ALJ should have ordered a consultative examination to develop the record regarding the loss of Scott's ring finger. (ECF No. 13 at 13). The ALJ has the duty to fully and fairly develop facts relative to a claimant's claim of disability. *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). When an ALJ fails in this duty, then there are insufficient facts in the record for the ALJ to make an informed decision, and the decision of the ALJ is, therefore, not supported by substantial evidence. *Id.* Thus, the ALJ's decision should be reversed if the claimant can show that "(1) the ALJ failed to fulfill [her] duty to develop the record adequately and (2) that failure prejudiced the [claimant]." *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012). "The decision to order a consultative examination is within the ALJ's bailiwick." *Harper v. Barnhart*, 176 F. App'x 562, 566 (5th Cir. 2006) (per curiam). And a "'full inquiry' does not require a consultative examination at government expense unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision." *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977).

16

As noted above, the only piece of evidence cited by Scott on this point is one page out of a 436-page record that included notes from his primary care physician, a licensed professional counselor, a treating psychologist, a Psychiatric Mental Health Nurse Practitioner, and two state agency consultative nurse practitioners. At the hearing, neither Scott nor his counsel alerted the ALJ or the VE that Scott was seeking consideration of any exertional limitations. Further, Scott has not pointed to any evidence that he sought a consultative examination. Thus, Scott has failed to meet his burden of establishing any physical limitation or to create a suspicion such that the ALJ failed to discharge her duty of "full inquiry." *See Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (per curiam) (concluding that the ALJ did not err by not ordering a consultative examination when claimant failed to list a non-exertional mental impairment in his original request for disabilities; did not request a consultative examination concerning the impairment; and failed to meet his burden in proving the impairment).

Finally, Scott argues that the ALJ failed to consider the combined effect of his mental and physical impairments. (ECF No. 13 at 24). As already discussed, Scott failed to assert any physical impairments or limitations in his disability application or at the hearing. Further, there is a dearth of evidence in the record indicating a physical disability. Thus, it was not error for the ALJ to not consider the combined effect of Scott's mental and physical impairments. Further, the ALJ gave great weight to Dr. Jones' opinion stating that Scott could excel at physical endeavors. (Tr. 18–19). Moreover, the ALJ cited to evidence in the record indicating physical activity such as working as a police officer after being cleared by a psychiatrist, (Tr. 16) and building a chicken coop, (Tr. 18). Thus, it appears the ALJ did consider some physical activity in assessing Scott's RFC. This is not to say, however, that the ALJ made any explicit finding related to any physical limitations

Scott may have, but this certainly could be because the ALJ was not on notice that he was claiming any physical disabilities and has failed to prove the existence of them.

### iii.    The ALJ properly discussed Scott's credibility.

Scott also argues that the ALJ "cherry picked" evidence and ignored his subjective complaints of grief and bereavement. (ECF No. 13 at 14–20). Scott claims he is so grief-stricken that he is unable to perform at the ALJ's RFC. (*Id.*). To support this argument, Scott highlights several excerpts from his testimony suggesting he is "failing at life, work, and play,' (*Id.* at 17), needs a controlled work environment, (*Id.* at 18), and argues the ALJ misconstrued statements made by Dr. Jones indicating he can perform physical endeavors, (*Id.*). Next, he argues that the ALJ failed to consider the entirety of the record by quoting a section of the ALJ's decision purportedly showing how she "cherry picked" evidence to substantiate Scott's mental RFC. (*Id.* at 19).

The undersigned construes this argument as an attack on the ALJ's credibility determination of Scott's statements of intensity, persistence, and limiting effects of his symptoms, which were not consistent with the medical evidence and other evidence in the record. (Tr. 15). Thus, the ALJ was required to make a credibility finding regarding Scott's statements. SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996). When assessing the credibility of a claimant's statements, the ALJ considers, in addition to the objective medical evidence, the following: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, which the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant

uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional capacity, limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96–7p, 1996 WL 374186, at *3. Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991) (per curiam). The ALJ is in the best position to assess a claimant's credibility because the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 160, 164 n.18 (5th Cir. 1994).

Although the ALJ did not specifically discuss each factor in outline form, so long as the decision is clear that the ALJ considered them, she was not required to do so. *Prince v. Barnhart*, 418 F. Supp. 2d 863, 871 (E.D. Tex. 2005). In her decision, the ALJ discussed Scott's testimony of his daily activities including attendance at his children's 4-H meeting and that he started his own 4-H club. (Tr. 15, Factor 1). In addition, the ALJ discussed Scott's testimony of his severe mental impairments, but noted that he continued to work as a police officer for over two-years. (*Id.*, Factor 1). The ALJ also cited to Scott's testimony where he stated that his "biggest problem now is becoming overwhelmed or aggravated with stressful situations, including crowds, changes from the 'norm,' and uncontrolled environments." (*Id.*, Factors 2, 3). The ALJ also discussed how Scott's mental impairments and symptoms improved significantly while he was on medication, and that Scott was initially treated weekly after the accident by a psychiatrist, but now only sees a psychiatrist once every three months. (*Id.*, Factor 4, 5). The ALJ discussed the notes from Trowbridge where Scott stated that he had been staying really busy "building on his home and working on a foundation support for his families with traumatic loss[.]" (Tr. 17) (Factor 6). And he had become more active since building a chicken coop and adopting an 18-year-old son. (Tr. 18) (Factor 6). The ALJ also cited to numerous medical records and opinions indicating the impact

of Scott's mental limitations on his functional limitations. (*See, e.g.*, Tr. 16) (concluding that Scott's tangential thought process and rapid, pressured speech supported a finding that he should be limited to simple, routine, and repetitive tasks) (Factor 7). The ALJ properly considered Scott's credibility and discredited his subjective complaints of more severe mental impairments because they were not supported by the record. *See Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991) (noting that it is appropriate for an ALJ to discredit a claimant's subjective complaints due to contradictory medical reports or daily activities).

This recitation also disputes Scott's assertion that the ALJ cherry picked evidence to support her RFC assessment. The ALJ specifically referred to Scott's subjective need for a controlled work environment and provided additional limitations in Scott's RFC to accommodate his mental impairments that were supported by the record. And as discussed above, the ALJ's RFC determination was supported by substantial evidence. Accordingly, the ALJ did not pick and choose the evidence to support her RFC assessment.

## **RECOMMENDATION**

For the foregoing reasons, the undersigned **RECOMMENDS** that United States District Judge Reed O'Connor **AFFIRM** the Commissioner's decision.

## **NOTICE OF RIGHT TO OBJECT TO FINDINGS, CONCLUSIONS, AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT**

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's Findings, Conclusions, and Recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's Findings, Conclusions, and Recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1).

Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

## **ORDER**

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party shall have until **January 24, 2019,** to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation. It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

Signed January 10, 2019.

Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE